# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| NATALIE and MILLARD JACKSON, | ) |
| Plaintiffs, | ) |
| v. | ) Docket no. 2:10-cv-1-GZS |
| TOWN OF WALDOBORO, et al., | ) |
| Defendants. | ) |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is the unopposed Motion for Summary Judgment (Docket # 21) by Defendants Town of Waldoboro, Zachary Curtis, William Labombarde and William Post (collectively "Defendants"). As explained herein, the Court GRANTS Defendants' Motion for Summary Judgment.

**I.     PROCEDURAL BACKGROUND**

On September 23, 2009, Plaintiffs Natalie and Millard Jackson filed a five count complaint in Maine Superior Court alleging violations of the Maine Civil Rights Act, the Maine Tort Claims Act, the Maine Wrongful Death Act, and certain federal and state constitutional rights, arising from the death of their son, Gregori Jackson, who was fatally shot by a Town of Waldoboro Police Officer exactly two years earlier on September 23, 2007. (Compl. (Docket # 2-2).) Following the Plaintiffs' mid-December filing of an amended complaint in state court (Am. Compl. (Docket # 2-1)), Defendants removed the case to federal court on January 4, 2010. (Notice of Removal (Docket # 1).) On March 28, 2010, Magistrate Judge Rich granted an *ex parte* motion filed by counsel for Plaintiffs seeking permission to withdraw from the case. (Order on Mot. to Withdraw (Docket # 14); see also Mot. to Withdraw (Docket # 6).) Plaintiffs

have yet to secure alternative counsel. (See Rep. of Hr'g & Order re: Status (Docket # 16); Rep. of Hr'g & Order re: Status (Docket # 20).)

Defendants filed for summary judgment on August 27, 2010. (Mot. for Summ. J. (Docket # 21).) In accordance with Local Rule 56(b), Defendants also filed a Statement of Material Facts, supported by affidavit and other record citation. (See Defs.' Statement of Material Facts ("SMF") (Docket # 22); Post Aff. (Docket # 23); Mitchell Aff. (Docket # 24); Curtis Aff. (Docket # 25).) Plaintiffs have failed to respond to this motion. See D. Me. Loc. R. 7(b) (requiring a written response within twenty-one days).

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Plaintiffs, now appearing pro se, did not file any objection to the motion for summary judgment. However, the failure of the non-moving party to respond does not automatically entitle the movant to summary judgment. See Fed. R. Civ. P. 56(e)(2) ("If the opposing party

does not so respond, summary judgment should, *if appropriate*, be entered against that party.") (emphasis supplied); Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 8-9 (1st Cir. 2003). In these circumstances, the Court still is obligated to "inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law." Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 118 (1st Cir. 2005) (citation omitted).

## III. FACTUAL BACKGROUND[1]

At the heart of this case is the tragic death of Gregori Jackson on September 23, 2007. It is undisputed that Mr. Jackson, who was then eighteen years old, was shot to death that day by Defendant Zachary Curtis, who was on patrol as a member of the Waldoboro Police Department (the "Police Department").

Officer Curtis graduated from the Reserve Law Enforcement Officers Course at the Maine Criminal Justice Academy (the "Academy") on April 1, 2005. In February of 2006, Officer Curtis began working as a part-time reserve officer with the Police Department. As of September 23, 2007, Officer Curtis was certified by the State of Maine to work as a reserve police officer, and the Academy also had expressly authorized Officer Curtis' ability to do so in a full-time position.[2]

---

[1] Because Plaintiffs did not respond to the Defendants' motion for summary judgment, the Court deems as admitted the factual statement submitted with that motion, as supported by the referenced affidavits and exhibits. (Docket #s 22-25.) See D. Me. Loc. R. 56(f) ("Facts contained in a supporting … statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."); Lawson v. Campbell, Civ. No. 09-226-P-H, 2010 WL 2803372, at *1 (D. Me. July 15, 2010) ("The plaintiff has not responded. Therefore, the Statement of Material Facts, which is properly supported by references to the summary judgment record, is deemed admitted.") (citations omitted). Cf. Ruiz Rivera v. Riley, 209 F.3d 24, 28 n.2 (1st Cir. 2000) ("[P]ro se status does not free a litigant in a civil case of the obligation to comply with procedural rules.") (citations omitted). Nonetheless, the Court notes that the factual recitation that follows largely corresponds with the allegations made in Plaintiffs' Amended Complaint. (See Am. Compl. ¶¶1-19.)

[2] In late 2006, the Police Department, which was normally staffed by six full-time police officers, was down to just three as a result of the departure of two full-time officers and the disabling injury suffered in the line of duty by a third. As a result of the Police Department being short-staffed, Officer Curtis began working as a full-time police officer at the beginning of 2007. In May of 2007, the Waldoboro Chief of Police retired, leaving the Police Department with only two full-time police officers. Because Officer Curtis had previously worked full time at the

3

When Officer Curtis began working for the Police Department, he had already completed the reserve law enforcement officer's course of training at the Academy, and also had satisfactorily completed field training required by his prior employer, the Kennebunkport Police Department.[3] Despite his previous training, Officer Curtis was still required to complete the Police Department's field training program before he was allowed to patrol on his own in the Town of Waldoboro (the "Town").[4] Officer Curtis participated in the Police Department's required field training program from February 17, 2006 to April 6, 2006. At that time, Officer Lance Mitchell was serving in the capacity of field training officer.[5]

One of the primary goals of this training program was to ensure that officers fully understood arrest powers and procedures and the lawful use of both non-deadly and deadly force in connection with arrests. To teach these concepts to new police officers, Officer Mitchell utilized legal precedents, the Town's Policies and Standard Operating Procedures, and the Maine

---

Kennebunkport Police Department and had begun working full time in Waldoboro at the beginning of 2007, under state law he could not work full time beyond June 2007 without returning to the Academy to complete the Basic Law Enforcement Officers Course. In extenuating and emergency circumstances, however, the Academy's Board of Directors has the authority to extend the 12-month period of "full time allowable work" for not more than 180 days. (See Curtis Aff. ¶1.) To allow the Town to have sufficient time to find and hire new full-time police officers, Acting Police Chief Jamie Wilson filed a written request to the Director of the Academy for Officer Curtis to be given an extension to continue working full time despite the fact that he had yet to complete this additional, required training. The extension request was granted by Director Rogers in writing on June 1, 2007, allowing Officer Curtis to continue working full time until September 30, 2007.

[3] Officer Curtis was employed temporarily as a reserve officer, but filling a full-time position, with the Kennebunkport Police Department from June of 2005 through October of 2005. Before patrolling on his own in Kennebunkport, Officer Curtis had to satisfactorily complete the Field Training Program of the Kennebunkport Police Department. The Field Training Program of the Kennebunkport Police Department included arrest authority and procedures, and the lawful use of force in connection with arrests, including both non-deadly force and deadly force.

[4] The Police Department Field Training Program Guide outlines the field training procedures utilized at the time of Officer Curtis' hire in February of 2006, both for the trainee and the field training officer.

[5] At all relevant times, Officer Mitchell was employed as a police officer with the Police Department. Officer Mitchell graduated from the Academy and is certified by the Academy to serve not just as a police officer but also as a field training officer responsible for training other Waldoboro police officers. In January of 2003, Officer Mitchell had responsibility for revising the Police Department's Field Training Guidelines (the "Guidelines"), which were based upon a program endorsed by the Academy while also addressing specific policies and procedures of the Police Department.

Law Enforcement Officers Manual. The field training program consisted of both formal classroom training, including written tests and examinations, as well as field training that provided hands-on experience under the supervision of Officer Mitchell. During hands-on training, officers were observed by Officer Mitchell while they, for example, initiated motor vehicle stops, conducted searches, made arrests, and used physical force to overcome resistance to being taken into custody. With regard to the use of deadly force, Officer Mitchell provided classroom instruction regarding when such force is authorized under the law, which was followed up with written quizzes or tests to evaluate the trainee's understanding of the topic. The field training program also required that Officer Curtis demonstrate knowledge of the Police Department's Policies and Procedures Manual to the satisfaction of Officer Mitchell. Under Officer Mitchell's supervision as his field training officer, Officer Curtis satisfactorily completed all parts of the Town's field training program, including training devoted to the standards governing the lawful use of force.[6]

All Town police officers also receive training in the Police Department's Policies and Standard Operating Procedures, including the Use of Force Policy. When existing policies are revised, all officers receive training on the revised policy. The Police Department's Use of Force Policy, effective December 9, 2003, was in effect throughout the period of Officer Curtis' field

---

[6] The field training records of every officer, including grades on tests, quizzes, interviews, and documents evidencing hands-on training, are kept as business records in the officer's personnel file with the Town. Accordingly, all records relating to Officer Curtis' field training were kept permanently in his personnel file, which was kept in the ordinary course of business by the Town. These records include: the Policy and Procedure Lesson from Officer Curtis' field training that concerned, *inter alia*, the lawful use of force (Curtis Aff., Ex. C (Docket # 25-3)); a written test completed by Officer Curtis regarding topics covered in the Maine Law Enforcement Officers Manual, including arrest procedures and the use of non-deadly and deadly force (id. Ex. D (Docket # 25-4); and Officer Curtis' Field Training Program Guide, including a page signed on April 11, 2006 by Officer Mitchell certifying Officer Curtis' satisfactory completion of the program (Mitchell Aff., Ex. A (Docket # 24-1) at 4); see also Mitchell Aff. ¶2 (explaining that field training officers are required to certify by signature that the trainee has satisfactorily completed the entire program).

training in 2006 and on the date of his use of deadly force against Gregori Jackson on September 23, 2007. (See Use of Force Policy, Mitchell Aff., Ex. B (Docket # 24-2).)

Thus, as of September 23, 2007, Officer Curtis had received training on the lawful use of non-deadly and deadly force from the Academy, the Kennebunkport Police Department and the Waldoboro Police Department. In working with Officer Curtis subsequent to his completion of field training, Officer Mitchell also never observed any deficiency in Officer Curtis' understanding of the lawful use of non-deadly and deadly force, and he is not aware of any complaints ever received against Officer Curtis alleging an excessive use of force on his part.

On September 23, 2007, Officer Curtis was on routine patrol on Route 220 in Waldoboro when he observed a motor vehicle fail to stop at a stop sign. As Officer Curtis followed the vehicle, he observed erratic operation, and the vehicle crossed the center line numerous times. Based on these observations, Officer Curtis activated his cruiser's blue lights and stopped the vehicle at approximately 2:14 a.m. Officer Curtis had in his possession a firearm—a semi-automatic handgun—issued to him by the Police Department.

The vehicle stopped by Officer Curtis was being operated by a minor and was registered to the minor's parents. Officer Curtis observed a passenger in both the front and rear seats of the vehicle. As Officer Curtis spoke to the driver, he could smell an odor of alcohol, which he determined was not coming from the driver but from inside the vehicle. Officer Curtis went to the passenger's side of the vehicle and spoke to the passenger in the front seat. Officer Curtis asked for identification from the front seat passenger. The front seat passenger identified himself as Gregori Jackson, but told Officer Curtis that he could not provide him with any identification. Mr. Jackson stated that his date of birth was "13/13/99," which made no sense to Officer Curtis. (Officer Curtis subsequently learned that Mr. Jackson was 18 years old.) Mr. Jackson's speech

6

was slurred. Based on the foregoing, Officer Curtis asked Mr. Jackson to get out of the vehicle, and when he did so Officer Curtis again detected a strong odor of alcohol coming from Mr. Jackson's facial area. Mr. Jackson was more than six feet one inches tall and moderately built.

By this time, Mr. Jackson was becoming noticeably agitated. The driver of the vehicle spoke to Mr. Jackson to try to get him to calm down and cooperate with the police officer. At approximately 2:28 a.m., Officer Curtis contacted Lincoln County Communications ("LCC") regarding Mr. Jackson. LCC informed Officer Curtis that Mr. Jackson had a suspended driver's license, was currently out on bail, and that, as a conditions of his bail, was not allowed to use or possess any alcoholic beverages or illegal drugs and was required to submit to testing and a search of his person, vehicle and residence. When Officer Curtis asked Mr. Jackson if he was aware that his bail conditions prohibited his use or possession of alcohol, he responded that he was aware of that bail condition. Because Mr. Jackson was out on bail and was clearly in violation of his bail conditions, Officer Curtis advised Mr. Jackson that he was placing him under arrest.

As Officer Curtis tried to take Mr. Jackson into custody, Mr. Jackson ran away from him and tried to run up a ledge just off the shoulder of the road. Officer Curtis pursued Mr. Jackson and pulled him back from the ledge to the rear of the motor vehicle; as Officer Curtis placed him against the vehicle and attempted to handcuff him, Mr. Jackson broke free. Officer Curtis again took hold of Mr. Jackson while Mr. Jackson continued to resist efforts to take him into custody. During the time Officer Curtis took hold of Mr. Jackson and was attempting to handcuff him, the driver and second passenger were yelling at Mr. Jackson to stop resisting the police officer. Officer Curtis tried to deploy his pepper spray against Mr. Jackson, but Mr. Jackson was able to break free and run down Friendship Road.

7

At approximately 2:31 a.m., Officer Curtis called LCC on his radio asking for assistance from other officers. Officer Curtis then pursued Mr. Jackson down Friendship Road, approximately twenty-five feet behind him. Approximately 150 yards from where the vehicle had been stopped, Mr. Jackson left the road and ran into the woods with Officer Curtis following behind. At times, Officer Curtis could hear Mr. Jackson walking in the woods. Officer Curtis yelled to Mr. Jackson that he was under arrest, but Mr. Jackson responded by saying "fuck off." At approximately 2:32 a.m., Officer Curtis advised LCC over the radio that he was now in the woods in pursuit of Mr. Jackson. Approximately two minutes later, Officer Curtis requested for LCC to send a police canine to his location.

At this point, Officer Curtis heard Mr. Jackson stop walking and saw him lying under a log. Officer Curtis drew his police-issued firearm and ordered Mr. Jackson to stay where he was. Suddenly, Mr. Jackson threw a log at Officer Curtis, striking him in the face with such force that it knocked his glasses off and caused him to drop his flashlight onto the ground. The blow from the log stunned Officer Curtis. Without his glasses, and with only the ambient light from the flashlight lying on the ground, Officer Curtis could only see approximately four- to- five feet. Officer Curtis returned his firearm to its holster as he saw Mr. Jackson getting caught in downed tree branches and brush as he tried again to run away.

Officer Curtis again ordered Mr. Jackson to stop and submit to arrest, but to no avail. Officer Curtis attempted to use his pepper spray again, but realized however that he had left the pepper spray can near the stopped vehicle. Officer Curtis then used his expandable baton to strike Mr. Jackson twice in the thigh; Mr. Jackson went to the ground, and Officer Curtis approached him to handcuff him. As Officer Curtis reached down, Mr. Jackson jumped him, knocking Officer Curtis onto his back and landing on top of him. At that point, Mr. Jackson was

physically dominating Officer Curtis from his position on top. Mr. Jackson began striking Officer Curtis in the head with his fist and elbow. Mr. Jackson also began choking Officer Curtis by placing his forearm across his throat. As they struggled, Officer Curtis felt Mr. Jackson pulling at his handgun in his holster. Officer Curtis used his hand to attempt to keep the gun in the holster and away from Mr. Jackson. Mr. Jackson then screamed: "Give me your gun, give me your fucking gun." Mr. Jackson also stated that he was not going to jail and that he "didn't care what it took." Mr. Jackson repeated these statements five- to- ten times during the struggle with Officer Curtis.

Officer Curtis believed he was going to lose consciousness from being choked; he also believed that if Mr. Jackson were to gain control of his gun, it would be used against him. At that point, Officer Curtis believed his life was in danger. Mr. Jackson eventually succeeded in pulling Officer Curtis' gun out of its holster and was briefly able to gain control of the gun. Officer Curtis was able to get his gun back, but Mr. Jackson continued to wrestle with him for control of it. As Officer Curtis and Mr. Jackson wrestled on the ground, the slide on this semi-automatic handgun was racked back and forth enough times to eject four unfired rounds out of the gun and onto the ground around them.

Officer Curtis now feared that he was going to be rendered unconscious as a result of the continued blows to his head being delivered by Mr. Jackson; he also knew, based on Jackson's prior statements and actions, that he wanted to gain control of the gun. While Mr. Jackson was still on top of him and continuing to strike him in the head, Officer Curtis believed that he was in imminent danger of losing his own life. As such, Officer Curtis made the decision to use deadly force. As Mr. Jackson and Officer Curtis struggled on the ground, Officer Curtis got control of his gun and pressed it into Mr. Jackson's side and fired. Mr. Jackson did not seem to react. With

9

Mr. Jackson still on top of him, Officer Curtis fired several more shots in rapid succession. Mr. Jackson instantly ceased his attack on Officer Curtis, and Officer Curtis then stopped firing upon realizing that the threat to him had ceased.

Officer Curtis believed he had fired his gun three times, but later learned that he actually fired five times. A forensic examination of Officer Curtis' gun later showed that the muzzle had Mr. Jackson's blood on it, indicating that the gun had been pressed directly against Mr. Jackson when it was fired. Although Officer Curtis intended for all of the fired shots to go into Mr. Jackson's side, the final shot apparently traveled up Mr. Jackson's back, striking the back of Mr. Jackson's head, which was immediately above Officer Curtis' own head.

By the time Officer Curtis' reinforcements arrived on the scene, Mr. Jackson was deceased. Even so, the deputy sheriff who first arrived on the scene used Officer Curtis' handcuffs to handcuff Mr. Jackson before attending to Officer Curtis. After additional officers came, Officer Curtis was taken by ambulance to the hospital where he was treated for abrasions to his face, neck, arms and hands. Officer Curtis also experienced considerable pain and burning in his eyes; the Emergency Room doctor advised him that this pain and burning was due to the lack of oxygen he experienced while being choked by Mr. Jackson.

At all times relevant to the claims made by Plaintiffs, Defendant Zachary Curtis was employed as a reserve police officer by the Town. By contrast, Defendant William Post was not employed with the Town at the time of the incident giving rise to this lawsuit; he has been employed with the Town as its Town Manager from March 10, 2008 through the present. Defendant William Labombarde was not employed with the Town at the time of the incident giving rise to this lawsuit; he began his employment with the Town as its Chief of Police on November 19, 2007.

On September 23, 2007, liability coverage for the Town and its employees was provided by the Town's membership in the Maine Municipal Association Property & Casualty Pool, a self-insured municipal risk pool. Under the Pool agreement, coverage for claims arising under state law is only available if the entity or the employees do not enjoy immunity under state law. The Town does not have any policy of liability insurance that provides indemnity to the Town or its employees for civil liability arising out of the events of September 23, 2007.

## IV. DISCUSSION

Following these tragic events, Natalie and Millard Jackson—acting as personal representatives of the Estate of Gregori S. Jackson—filed suit against the Town of Waldoboro, Officer Zachary Curtis (both individually and in his capacity as Town Police Officer), William Labombarde (in his official capacity as the Town's Police Chief), and William Post (in his official capacity as Town Manager). Specifically, the Complaint contains five counts undifferentiated among the Defendants: (1) 42 U.S.C. § 1983 action alleging violation of the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Article I, Sections Five and Nine of the Maine Constitution, and 15 M.R.S.A. § 704; (2) Maine Civil Rights Act, 5 M.R.S.A. § 4681, et seq.; (3) Maine's Wrongful Death Statute, 18-A M.R.S.A. § 2-804(a), as incorporated within the Maine Tort Claims Act, 14 M.R.S.A. § 8104-C; (4) Wrongful Death Statute survival claim; and (5) a negligence claim. Plaintiffs seek a declaration that their eighteen-year-old son was deprived of his rights and an award of unspecified compensatory and punitive damages. Defendants collectively have moved for summary judgment on all counts. The Court addresses each count in turn below.

### A. Count I: 42 U.S.C. § 1983[7]

The central allegation of Count I is that Defendant Curtis used excessive force against Jackson.[8] While Plaintiffs claim this alleged use of excessive force implicates rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments, it is well established that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" Graham v. Connor, 490 U.S. 386, 395 (1989)); see also id. ("[T]he Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment … must be the guide for analyzing these claims."). Thus, to the extent Plaintiffs assert violations of the Fifth, Eighth and Fourteenth Amendments in Count I, Defendants are entitled to summary judgment. See e.g., Estate of Bennett v. Wainwright, 548 F.3d 155, 163 (1st Cir. 2008).[9]

---

[7] In Count I, Plaintiffs assert under Section 1983 of the federal Civil Rights Act violations of the Maine State constitution and the state statute, 15 M.R.S.A. 704, prohibiting the wanton or oppressive use of force when making warrantless arrests. By its own terms, however, Section 1983 is a *federal* remedy statute enabling individuals to pursue civil actions to vindicate *federal* constitutional and statutory rights when they have suffered a deprivation at the hands of a state actor. See 42 U.S.C. § 1983; see also Albright v. Oliver, 510 U.S. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred.") (citations and internal punctuation omitted); Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) (explaining that an essential element of a claim under 42 U.S.C. § 1983 is that the alleged conduct "must have deprived the plaintiff of rights secured by the Constitution or by federal law").
  Thus, to the extent Plaintiffs assert any state constitutional or statutory claims in Count I, Defendants are entitled to summary judgment and the Court will limit its consideration of Count I to alleged federal violations.

[8] Plaintiffs nowhere allege, for example, that Curtis lacked the legal right to arrest Jackson; in fact, the Amended Complaint states as facts that Curtis received information that Jackson was out on bail, observed Jackson to be in violation of bail conditions, and therefore determined that he was subject to arrest. (See Am. Compl. ¶¶ 11-12.)

[9] In any event, it is also long established that: the lack of alleged conduct by any federal actors necessitates dismissal of a Fifth Amendment claim, see, e.g., Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8-9 (1st Cir. 2007); the Eighth Amendment applies to protect convicted prisoners from cruel and unusual punishment due process, see, e.g., Elliot v. Cheshire Cnty., 940 F.2d 7, 10 n.2 (1st Cir. 1991); that the due process clause of the Fourteenth Amendment applies to pre-trial detainees who are in custody but are not yet convicted, see, e.g., id. (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)); and that a substantive due process claim under the Fourteenth Amendment can only advance where no other constitutional claim is available, Estate of Bennett, 548

*1. Individual Liability for Officer Curtis*

In moving for summary judgment on Plaintiffs' Fourth Amendment claim against Officer Curtis, Defendants contend that no constitutional violation took place because Officer Curtis' actions were reasonable under the circumstances, and in the alternative, that Curtis is entitled to qualified immunity despite any violation.

"An arrest is a form of fourth amendment seizure and the use of force to effect it must be reasonable under all the circumstances." Statchen v. Palmer, --- F.3d ---, ---, No. 09-2418, 2010 WL 4027830, at *2 (1st Cir. Oct. 15, 2010) (citing Graham, 490 U.S. at 396); see also Estate of Bennett, 548 F.3d at 173 (citations omitted) ("A violation of the Fourth Amendment premised on excessive force is established if an officer exerts force against a plaintiff that is unreasonable under the circumstances.") (citations omitted). "Reasonableness in this context is an objective inquiry based, not on the officer's underlying motivation, but on facts and circumstances that 'must be judged from the perspective of a reasonable officer on the scene.'" Id. (quoting Graham, 490 U.S. at 396). In assessing reasonableness, the Court must remain mindful that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.

In Graham, the United States Supreme Court gave specific guidance on the "proper application" of this test of objective reasonableness: the Court here is to pay "careful attention to the facts and circumstances of [the] case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

---

F.3d at 163 (citing Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004) (stating that substantive due process "may itself be invoked to challenge executive conduct where no other constitutional provision more directly applies")); see also Graham, 490 U.S. at 395.

actively resisting arrest or attempting to evade arrest by flight." Id. at 396; see also Morelli v. Webster, 552 F.3d 12, 23 (1st Cir. 2009) (describing the Graham factors as a "non-exclusive list of criteria for determining the objective reasonableness of a police officer's use of force"). Accepting the Defendants' version of events as true—as the Court must, in light of Plaintiffs' failure to place a single one of Defendants' facts in dispute—all three Graham factors weigh strongly in Defendants' favor.

First, any initial doubt as to the severity of Jackson's alleged crime—a violation of bail conditions based on the consumption of alcohol by a minor, see 15 M.R.S.A. § 1092(1) (violation of conditions of release generally is a Class E crime)—was erased when Jackson assaulted Officer Curtis in the dark of the woods by throwing a log at his face. Next, the Plaintiffs' own complaint makes plain that Jackson both resisted arrest by Defendant Curtis and attempted to evade arrest by flight. (See Am. Compl. ¶ 12 ("Officer Curtis attempted to place … Jackson under arrest. After a brief struggle … Jackson ran down the road on which the car was stopped and into adjoining woods.").) More importantly, the evidence presented also reveals that at the point the fatal injury occurred, Jackson continued to actively resist arrest.

The Court turns, finally, to whether Curtis posed an immediate threat to Officer Curtis. At the time Curtis made the decision to use deadly force against Jackson, Curtis had already used his hands, pepper spray, and an impact weapon in his attempt to overcome Jackson's resistance to being taken into custody. None of these methods proved effective. Throughout, Jackson was both heavily intoxicated and extremely agitated. Once Jackson jumped Curtis in the woods, Curtis—who was on his back with Jackson on top of him—was not able to overcome the position of physical superiority Jackson had gained. Jackson had already struck Officer Curtis in the face with a log, which both stunned him and impacted his ability to see due to the loss of his

glasses. Jackson fought with Curtis to try to get control of the officer's handgun and, in fact, did gain control of the gun briefly before Curtis was able to wrestled it away from him; in the course of this struggle, four unfired bullets were ejected from the gun and onto the ground. Based on these facts, there is more than sufficient evidence that Jackson posed a considerable and immediate risk to the safety, and indeed the life, of Officer Curtis. See, e.g., Graham, 490 U.S. at 396 (cautioning that reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight"); Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007) (finding an officer acted reasonably when, in an emergency situation and faced with an imminent threat, "she made a split-second judgment" and "fired a fusillade" of bullets at her attacker); Gonzalez v. Keeler, Civ. No. 07-11201-RGS, 2009 WL 3152887 (D. Mass. Sept. 29, 2009) (finding no constitutional violation in fatal shooting of individual actively attempting to assault a police officer).

Thus, given these extreme circumstances and the clear, imminent threat, the Court concludes a rational jury could, "without serious question," find that the force used by Curtis was not "so disproportionate as to offend the Fourth Amendment." Morelli, 552 F.3d at 23; see also Estate of Bennett, 548 F.3d at 175 ("While the result is tragic, we cannot conclude that the officers' actions were so deficient that no reasonable officer in their position would have made the same choices under these circumstances."). The conclusion that the force exerted by Officer Curtis was reasonable under the circumstances means that Plaintiffs' Section 1983 claim fails due to lack of a constitutional violation. Likewise, a similar analysis of the reasonableness of Curtis' actions by the Court readily yields the conclusion that Curtis also is entitled to qualified immunity for his use of deadly force. See Pearson v. Callahan, --- U.S. ----, ----, 129 S. Ct. 808, 815 (2009) (Qualified immunity "protects government officials from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); Roy v. Inhabitants of Lewiston, 42 F.3d 691, 694-95 (1st Cir. 1994) (noting the reasonableness determination is properly made by the court in the context of qualified immunity).[10] In short, Defendant Curtis is entitled to summary judgment on Count I based on qualified immunity and the lack of evidence to support a finding of excessive force.

2. *The Other Defendants*

In Count I, Plaintiffs have also asserted corresponding vicarious and municipal liability claims against the Town. (See Am. Comp. ¶ 27 (alleging that the Town, Town Manager, and Police Chief "maintain[ed] a custom or policy that failed to ensure the adequate training, supervision and control of the Waldoboro police officers … and thereby failed to enforce the laws concerning the use of excessive and deadly force"); id. at ¶¶ 25-26 (alleging that the Police Chief failed to supervise the training of Officer Curtis and to enforce the applicable laws governing the use of force); id. at ¶ 28 (alleging the Town failed to require the Police Chief to

---

[10]In Pearson, the Supreme Court established that the qualified immunity is a two part test. "A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009) (citing Pearson, 129 S.Ct. at 815-16); Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 526 & n.20 (1st Cir. 2009).

Even if the Court were to assume Plaintiff could make out a violation of a constitutional right, the Court would alternatively conclude that Officer Curtis was entitled to qualified immunity under the second part of the Pearson test. See Statchen v. Palmer, No. 08-cv-128-JD, 2009 WL 2997982 (D. N.H. Sept. 15, 2009) (indicating that, post-Pearson, the qualified immunity analysis has only two steps, although the second step has two parts) (citing Maldonado, 568 F.3d at 269). Under this second stage of the qualified immunity inquiry, despite a clearly established and well-known right to be free from excessive deadly force, a reasonable officer standing in Curtis' shoes—struggling in the woods against an out-of-control and intoxicated young man resisting arrest—would not have understood that his actions amounted to excessive force proscribed by the Fourth Amendment. See, e.g., Estate of Bennett, 548 F.3d at 176 (holding that officers were entitled to qualified immunity on excessive force claim because they reasonably—even if mistakenly—could have believed that the decedent posed a continuing, imminent threat); Roy, 42 F.3d at 695 (noting that the standard is that of "the 'reasonable officer' and what 'could reasonably have been thought lawful' by such an officer, terms suggesting a measure of deference") (internal citation omitted)); Berube, 506 F.3d at 85 (holding that the officers' decision to fire even after the attacker went to the ground was a split-second judgment in an emergency situation). As such, Officer Curtis' use of deadly force is entitled to qualified immunity.

have adequate policies and procedures on the use of firearms). In moving for summary judgment on Plaintiffs' Fourth Amendment claim against the Town,[11] Defendants assert that there is no basis for either a vicarious liability claim or a municipal liability claim for any alleged failure to adequately train, supervise or control a Town police officer.

First, to the extent the Court just determined that Defendant Curtis did not violate Jackson's Fourth Amendment rights, Plaintiffs' contention against the Town for vicarious liability also fails. See, e.g., Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998) ("Normally … a municipality cannot be held [vicariously] liable unless its agent actually violated the victim's constitutional rights."). As to any municipal liability claim against the Town based on a failure to train Officer Curtis, the "liability criteria" for such claims "are exceptionally stringent." Id. (citing City of Canton v. Harris, 489 U.S. 378, 388-89 (1989)):

> Only if the failure to train "amounts to *deliberate indifference* to the rights of persons with whom the police come into contact," and is "closely related" to, or "the moving force" behind, the constitutional injury, can the claim against the municipality prevail.

Id.; see also Estate of Bennett, 548 F.3d at 177.

In this case, the record is devoid of any evidence of an unconstitutional custom, policy or practice or deliberate indifference to the supervision, control, disciplining or training of personnel. Nor is there any evidence in the record to infer that any custom or practice was the moving force behind the deprivations alleged. Rather, the undisputed facts before the Court

---

[11] As stated above, while Defendant Post is the current Town Manager and Defendant Labombarde is the current Police Chief for the Town of Waldoboro, neither served in this capacity at the time of the events giving rise to this lawsuit. Accordingly, Plaintiffs properly have sued both only in their official capacities. (See Am. Compl. ¶¶ 5-6.). Any claims against these individual defendants, however, are duplicative of the claims against the Town of Waldoboro, which has also been named as a party. See, e.g., Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself."); Burrell v. Hampshire Cnty., 307 F.3d 1, 7 (1st Cir. 2002) ("A damages suit against an official in an official capacity is tantamount to a suit against the entity of which the official is an agent[.]"). The Court's reference in the following discussion to "the Town" therefore encompasses Plaintiffs' claims against both the Town of Waldoboro and Defendants Post and Labombarde.

establish that the Town Police Department had adopted a specific policy regarding the lawful use of force. The facts also show that Officer Curtis received use of force training, including the use of deadly force, at the Maine Criminal Justice Academy, the Kennebunkport Police Department, and at the Town Police Department before he was ever allowed to patrol alone in the Town. This training included classroom instruction, written testing, and demonstrated hands-on proficiency at various tasks associated with his job, including demonstrating his knowledge of the lawful use of force. Curtis had never previously been the subject of a use of force complaint. In short, the Court finds that no theory of municipal liability exists that would support liability against the Town. See, e.g., Estate of Bennett, 548 F.3d at 177-78.

In sum, the Court concludes that all Defendants are entitled to summary judgment on all of Count I.

   B. **Count II: Maine Civil Rights Act**

In Count II, Plaintiffs allege that Defendants are liable under the Maine Civil Rights Act ("MCRA"), 5 M.R.S.A. § 4681 et seq., because they engaged in "intentional interference … with Gregori Jackson's enjoyment of [Count I's] federal and state constitutional and statutory rights[.]" (Am. Compl. ¶ 32.) The MCRA, which provides a general remedy for violations of federal and state constitutional and statutory rights, is "patterned" after Section 1983. LaPlante v. United Parcel Serv., Inc., 810 F. Supp. 19, 22 (D. Me. 1993). As such, disposition of a claim under Section 1983 controls a claim brought under MCRA. Berube, 506 F.3d at 85; see also Forbis v. City of Portland, 270 F. Supp. 2d 57, 61 (D. Me. 2003). This includes a defense of qualified immunity. See, e.g., Jenness v. Nickerson, 637 A.2d 1152, 1159 (Me. 1994).

Thus, Defendants are entitled to summary judgment as to the allegations of Count II for the same reasons they are entitled to summary judgment on Plaintiffs' Section 1983 claim in Count I.[12]

### C. Counts III-V: Maine Tort Claims Act, Wrongful Death Statute and Negligence

In moving for summary judgment on Plaintiffs' remaining state law claims, Defendants correctly assert that these claims are all subject to the provisions of the Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. § 8101 et seq.

Section 8111(1) of the MTCA confers absolute immunity from civil liability to governmental employees who, *inter alia*, are performing "discretionary" functions and/or "intentional act[s] or omission[s] within the course and scope of employment," unless those intentional (in)actions are "found to have been in bad faith." Id. § 8111(1)(C) & (E). "A law enforcement official's use of force is a discretionary act." Dimmitt v. Ockenfels, 220 F.R.D. 116, 125 (D. Me. 2004) (quoting Comfort v. Town of Pittsfield, 924 F. Supp. 1219, 1236 (D. Me. 1996)). As such, a police officer's use of force is subject to absolute immunity absent conduct "so egregious as to clearly exceed any discretion the officer[] could have possessed under the circumstances." Berube, 506 F.3d at 86 (quoting Dimmitt, 220 F.R.D. at 125). Because the Court has already found that Officer Curtis' conduct was reasonable under the circumstances, that conduct cannot be said to be so egregious as to deprive the officer of the immunity defense. See, e.g., id.; Leach v. Betters, 599 A.2d 424, 426 (Me. 1991) ("At best, the record supports the conclusion that the officers may have used more force than was necessary but it contains no suggestion that they used more force than they reasonably thought to be

---

[12] In Count I, Plaintiffs also included a claim that Defendants acted in violation of 15 M.R.S.A. 704, (see Am. Compl. ¶ 22), which allows a person injured by a warrantless arrest in which the arresting officer acted "wantonly or oppressively" to recover damages for his injuries. To the extent this part of Count I survives, the Court concludes that just as Curtis' use of force was reasonable and not excessive, he is entitled to summary judgment for any claim based on it being wanton or oppressive. Cf. Berube, 506 F.3d at 86; Creamer v. Sceviour, 652 A.2d 110, 115 (Me. 1995); Leach, 599 A.2d at 426.

19

necessary. There is no hint of ill will, bad faith, or improper motive. The officers may have been mistaken, but their conduct cannot be characterized as wanton or oppressive.").[13]

Finally, the Court determines that none of the conduct alleged falls within the exceptions to immunity found in Section 8104-A of the MTCA, as limited by 8104-B. Moreover, although the Town's right to immunity may be waived by the purchase of a policy of liability insurance, see 14 M.R.S.A. § 8116, the Town has not done so.

As such, the Court concludes that the Defendants are entitled to summary judgment as to all remaining state law claims.

## V. CONCLUSION

For the reasons explained herein, the Court GRANTS Defendants' Motion for Summary Judgment (Docket # 21). The Court ORDERS judgment be entered in favor of Defendants.

SO ORDERED.

    /s/ George Z. Singal
    United States District Judge

Dated this 19th day of November, 2010.

---

[13] To the extent Plaintiffs allege violations of Maine's Wrongful Death Statute in both Counts III and IV, these statutes simply provide a means for a claim by a decedent's personal representative, either for the death itself or suffering prior to death. See 18-A M.R.S.A. § 2-804. As such, it does not confer any separate cause of action, but depends on an independent cause of action to exist under the law. See Shaw v. Jendzejec, 717 A.2d 367, 369 (Me. 1998) (noting that the "wrongful death cause of action" is "dependent on a cause of action that the deceased would have possessed had death not ensued"); Farrington v. Stoddard, 115 F.2d 96, 99-100 (1st Cir. 1940) (clarifying that no new rights are conferred pursuant to this statute other than to allow a class of cases to proceed that were formerly barred under current law).